HARRIET H. VILAS et al., Administrators, etc., Respondents,
*v.* JOHN B. PAGE et al., Appellants.

106  439
123  453
123  511

In an action to foreclose two railroad mortgages, V., one of the defendants
answered, setting up a title to certain of the rolling stock under a levy
and sale on execution against the railroad corporation; he claiming that,
as against him, the mortgages were void as to personalty, because not
filed as chattel mortgages.   An interlocutory judgment was rendered
in February, 1857, adjudging that the mortgaged property, other than
that claimed by V., be sold, and referring the issues presented by his
answer.   Upon sale made in September, 1857, under the said judgment,
the property was bid off by a committee representing the first mortgage
bondholders; but a small amount, if any, of the sum bid was paid down.
In March, 1858, upon petition of the receiver appointed in the action
and on affidavit of the plaintiffs' attorney, an order was granted which
authorized the receiver to expend a sum not exceeding $27,500 in the
purchase of necessary rolling stock for the road, on a credit, provided
the purchase should be approved by plaintiffs or their attorney, and
directing that sufficient of the purchase-money of the mortgaged
premises be applied to pay the sum the receiver might contract to pay
for the said rolling stock; which sum the order declared was thereby
made "a first lien on the said mortgaged property and all proceeds
thereof which may come into" the court.   In August, 1858, the
receiver entered into a contract with V., which was approved by
plaintiffs' attorneys, by which V. released to the receiver the said
rolling stock, and it was agreed that, in case it should be finally
determined that said property belonged "absolutely and beneficially"
to V., he should be paid $18,000 for the release, and that the same should
be a first lien upon the mortgaged property.   The receiver continued in
possession of the mortgaged property operating the road, apparently in
the interest of the purchasers, and using the property purchased of V.
until 1868.   In August of that year the sale under the interlocutory
judgment was completed by a conveyance to the purchasers, in which
the property claimed by V. was excepted, but the receiver executed a
transfer of his title and interest and turned over said property to a new
corporation organized by the purchasers to take the title and to operate
the road; and it was thereafter used on the road.   The consideration for
the conveyance was paid almost wholly by the surrender of bonds.   The
claim of V., was by the final judgment in the foreclosure suit, determ-
ined in his favor, subject to the right of redemption, if any existed.
In an action by V. to enforce an alleged lien upon the road given by the
agreement with the receiver of August, 1858, *held*, that the order of
March, 1858, was valid and binding upon the parties to the foreclosure

suit and upon the bondholders, the purchasers on the foreclosure sale; as, when it was made, title had not passed under said sale; that said purchasers by their conduct and delay acquiesced in the operation and management of the road by the receiver in the usual way; that the lien authorized by said order was not simply upon the proceeds of the sale, but upon the *corpus* of the property, and, as there were no such proceeds to which the lien could attach or be transferred, it remained attached to the property and followed it into the hands of the purchasers and all subsequent assignees chargeable with notice thereof; that the agreement with V. was authorized by said order; that the determination referred to therein was of the issue raised in the foreclosure suit, and its decision in his favor entitled him to payment of the stipulated price and to a lien therefor on the mortgaged property.

The order of March, 1858, was duly made at Special Term, with a direction that it be entered by the clerk. It was duly filed in the proper clerk's office and the date of filing indorsed thereon by the clerk, but, through mistake on his part, it was not transcribed on the records. *Held*, that the order became effective as an authority to the receiver upon its being filed, and the authority was not affected by the omission of the clerk to enter it.

In September, 1867, the holders of the first mortgage bonds entered into a contract with P. and others for the purpose of organizing a new corporation, by which they transferred said bonds to P. and his associates, and agreed to organize the new company, and that it should acquire title to all the property of its predecessor, subject to the claim of V., "if any shall finally be adjudged;" and to pay any floating debts incurred by the receiver "which constitute any lien upon the railroad." The purchasers agreed to assume and prosecute the litigation against V. and in case of any recovery in his favor to indemnify the sellers and the receiver against the same. *Held*, that said agreement imposed no personal liability upon P. and his associates to V.; and that a personal judgment in his favor against them was unauthorized.

Also, *held*, that the costs adjudged in favor of V. in the foreclosure suit were not included in his agreement with the receiver and could not be charged as a lien upon the property.

A court of equity, having possession in a foreclosure suit of the property of a railroad company, has jurisdiction to authorize the creation of debts for rolling stock and other purposes, when, in its opinion, it is necessary so to do to secure the continued and successful operation of the road, and to charge the debts so created as a first lien on the mortgaged property.

The court is not divested of its power and duty of managing the property by reason of a sale which the purchasers delay or neglect for many years to complete.

(Argued May 21, 1887; decided October 4, 1887.)

APPEAL from judgment of the General Term of the Supreme Court in the third judicial department, entered upon an order made July 2, 1883, which affirmed a judgment in favor of plaintiffs entered upon a decision of the court on trial at Special Term.

This action was brought to foreclose an alleged lien upon certain railroad property and to charge certain of the defendants individually with the indebtedness, the subject of said lien.

The facts, as found by the court, are substantially as follows:

The Plattsburgh and Montreal Railroad Company was organized on the 28th day of March, 1850, under the general railroad act of 1848. It issued bonds amounting to $400,000, secured by two mortgages to the same trustees for $200,000 each. In October, 1856, suit was brought by the trustees, and one of the first mortgage bondholders for the foreclosure of these mortgages. Plaintiff's intestate, Samuel F. Vilas, and the defendant, the Plattsburgh and Montreal Railroad Company, were made parties defendant. Before the commencement of the foreclosure suit divers judgments had been recovered against the said company, among which was one in favor of Vilas, recovered April 10, 1854, for $19,828.23. Executions were issued on these judgments. Vilas at that time was a director of the company. He was requested to bid off the property that might be sold in the interest of the company, but he declined so to do, and informed the officers of the company before the sale that he should bid in his own interest, and he afterward bid in certain rolling stock and other property of the company. With the avails of these sales the sheriff satisfied all the judgments and executions against the company, except that in favor of Vilas, and there was applied upon that, May 20, 1854, $1,890.25, and the execution in favor of said Vilas was returned unsatisfied as to the balance. On the 8th day of April, 1854, Vilas leased the greater part of the property bid in by him to the said company. This lease continued until February, 1855, when the company leased its road to Edward V. Price,

who also leased from Vilas the rolling stock bid off by him, and this lease continued until the railroad and property of the company went into the hands of a receiver. Vilas put in an answer in the foreclosure suit, setting up his title under the judgment and execution sales, alleging, among other things, that the mortgages in question had never been filed as chattel mortgages, and claiming to hold the rolling stock and other personal property purchased by him at sheriff's sale, as his own, free and clear of and from all lien of said mortgages; but consenting that judgment might be entered in that action for the foreclosure of the mortgages and the sale of the railroad and fixtures. An interlocutory judgment was entered February 28, 1857, adjudging that the railroad and equipments other than the rolling stock and personal property claimed by Vilas in his answer, be sold, and referring the issues formed by the answer of Vilas. A sale was made under said judgment September 24, 1857. The property was bid off by a committee of the first mortgage bondholders. Moss K. Platt was appointed as receiver of the said company in the said foreclosure suit in 1857. From the time of his appointment until May 1, 1858, the receiver rented of Vilas a portion of the property bid off by him as aforesaid. On March 10, 1858, upon the application of the plaintiffs, on petition of the receiver in the action referred to, the court made an order authorizing the receiver to purchase the necessary rolling stock for the railroad, provided he could make such purchase for a sum not exceeding $27,500, and upon a credit of not less than six months, and provided also that such purchase should be approved by the plaintiffs or their attorney, and also providing, among other things, that the amount which the receiver might contract to pay for such rolling stock, with all interest that might accrue thereon, should be the first lien on the mortgaged premises and all the proceeds thereof which might come into court, or should be subject to its disposition or authority. This order was duly granted and indorsed by the justice granting it with a direction to the clerk to enter it in the New York clerk's

office; it was filed the same day it was made, March 10, 1858, but by mistake of the clerk it was not entered on the records. On the 27th day of August, 1858, the receiver and Vilas entered into a written agreement, entitled in the foreclosure suit, upon which this action is based. This agreement was approved and executed by Henry P. Fessenden, plaintiff's attorney in the said suit. By it Vilas released to the receiver the property so bid off by him and it was thereby mutually agreed "that if it shall finally be determined in or by this or any other action or proceeding that the said property belongs absolutely and beneficially to the said Vilas, he shall be paid for the foregoing release the sum of $18,000, with interest from the 1st of May last, 1858." The referee, after hearing the evidence and argument, made his report, dated June 16, 1866, by which he found in substance that the mortgages in question, not having been filed as chattel mortgages, were void as to judgment creditors and were not liens upon the property claimed by Vilas, and that the said Vilas owned the same under his purchase and execution sale. The Supreme Court at a Special Term, however, sustained the exceptions of the plaintiffs in that action to this report and ordered judgment for the plaintiffs on the 24th day of January, 1867. Vilas appealed from the Special Term decision to the General Term, and the order of the Special Term was affirmed April 6, 1868.

After the decision at Special Term and before that of the General Term, to wit, on September 13, 1867, an agreement was made between Timothy Hoyle and Moss K. Platt and Michael J. Myers, being the owners of first mortgage bonds amounting to $179,200, as parties of the first part, and the defendants, John B. Page, Peter Butler and George B. Chase, together with one Oakes Ames, as parties of the second part. By this agreement the parties of the first part agreed to organize a corporation for the operation of the Plattsburgh and Montreal Railroad by such name as might be requested by the parties of the second part, and sold their bonds to the parties of the second part for the sum of $300,000. This agreement con-

tained the following clause : " They (the parties of the first. part) are to pay or cause to be paid, the costs in the Vilas branch of that suit, and in that branch they are to pay the plaintiff's costs to this date. The purchasers are to assume the conduct and prosecution of that suit and to abide its result and judgment, and if there shall be any recovery in said Vilas' favor, the purchasers agree to indemnify the said parties of the first part and said Platt, as receiver, against the same." Before the making of this agreement the defendant Paige, acting for himself and the defendants Butler and Chase, and for Oakes Ames, had actual knowledge of the agreement of August 27, 1858, between the receiver and Vilas. On July 7, 1868, the said Page, Butler and other parties of the second part in the above-mentioned agreement, executed their power of attorney, appointing Michael J. Myers, Timothy Hoyle and Richard M. Blatchford, their attorneys and committee, to receive and take from the referee, who made the sale, in their names and in trust for them, the deed of conveyance of the property sold under foreclosure sale, and thereupon to recon-vey the same to such person, persons or corporation as they might request. On the 31st day of July, 1868, upon the petition of Michael J. Myers and Timothy Hoyle, an order was made in the foreclosure suit, directing a conveyance by the referee to the said Blatchford, Myers and Hoyle, in trust for the first mortgage bondholders, Page, Butler and others, of the property, rights and franchises described and referred to in the two mortgages. On the 20th day of August, 1868, articles of association of the Plattsburgh and Montreal Railroad Company were signed, among others, by Moss K. Platt, Timothy Hoyle and Michael J. Myers, and by the defendants John B. Page, George B. Chase and Peter Butler. On the same day Henry J. Scudder, referee, exe-cuted a conveyance of the premises covered by the mort-gages to said Blatchford, Myers and Hoyle, in trust for holders of bonds secured by the first mortgage. This deed refers to the answer of Vilas and to his claim to own certain of the rolling stock and equipments, which are excepted from

the conveyance. On the 25th day of September, 1868, said Moss Platt, Michael J. Myers, Timothy Hoyle and Smith M. Weed, executed a bill of sale to the Montreal and Plattsburgh Railroad Company of all their right, title, interest, etc., in and to the property claimed by Vilas, which bill of sale contains the following clause: "Nothing herein to effect or impair any of the covenants in a certain agreement bearing date the 13th day of September, 1867, by which John B. Page and others are to prosecute the case with said Samuel F. Vilas and abide its result." The said Blatchford, Myers and Hoyle, by deed dated August 20, 1868 but not completely executed until the 12th of July, 1869, at the request of defendant John B. Page and his associates, conveyed the mortgaged property to the Montreal and Plattsburgh Railroad Company. This deed also referred to the answer of said Vilas and his claim to a portion of the railroad equipments, which were excepted from the conveyance. Said Vilas appealed from the General Term decision against him to the Court of Appeals; that court reversed the orders of General and Special Terms, and affirmed the decision of the referee. (54 N. Y. 314.) On the 25th day of February, 1873, the said Montreal and Plattsburgh Railroad Company, by an agreement made under the act authorizing the consolidation of railroad companies, passed May 20, 1869, became consolidated with certain other railroad companies, and became and is now a part of the defendant, the New York and Canada Railroad Company, which consolidated company was, by the terms of said agreement to possess all the rights and privileges, and to be subject to the like duties and responsibilities provided by said act; and this agreement of consolidation was duly ratified. On the 10th day of December, 1872, the defendant, the Delaware and Hudson Canal Company, purchased of the defendants, John B. Page and others, the greater part of the stock of the Montreal and Plattsburgh Railroad Company, and is now in possession of the roads of the said consolidated company, the defendant, the New York and Canada Company, under an agreement for a perpetual lease of the same.

Vilas, upon the faith of his agreement with the receiver of August 27, 1858, and the order of March 10, 1858, relinquished and gave up to the receiver the rolling stock and other property mentioned in said agreement; all this property remained in the possession of the said receiver until the organization of the Montreal and Plattsburgh Railroad Company, and was then by the receiver delivered to the said company, and has ever since, except so much as has been worn out, destroyed or disposed of, been in the possession of the Montreal and Plattsburgh Railroad Company, or the New York and Canada Railroad Company, or the Delaware and Hudson Canal Company, and said Vilas has had no benefit therefrom since the date of said agreement, nor has he received any part of the purchase-price thereof.

Judgment was rendered herein against the defendants, Page, Butler and Chase, for $52,803.73, damages and costs, and declaring the same a first lien on the railroad premises in question and directing a sale thereof.

*Peter B. Olney* for Peter Butler, appellant. The latter portion of the agreement of September 13, 1867, is merely an agreement of indemnity, pure and simple.. There can be no breach of it or liability on the part of the purchasers till the vendors have actually suffered harm or damage. (*Gilbert* v. *Wiman*, 1 N. Y. 550, 561; *Turk* v. *Ridge*, 41 id. 201; *Belloni* v. *Freeborn*, 63 id. 384, 390; *Kohler* v. *Matlage*, 72 id. 259, 266.) The agreement of Butler and associates to abide the result of such judgment as this, and to indemnify the vendors against such a recovery of Vilas did not make them personally liable to Vilas for the price or value of his rolling stock fixed by him and the receiver. (*Belmont* v. *Coman*, 22 N. Y. 438, 439, 440; *Ricard* v. *Sanderson*, 41 id. 180; *Dingledein* v. *Third Ave. R. R. Co.*, 34 id. 575; *Vrooman* v. *Turner*, 69 id. 280; *Carter* v. *Holahan*, 92 id. 498.) As Butler and his associates had no actual knowledge or notice of the agreement of August 27, 1858, they are not chargeable with such knowledge and notice.

(*Williamson* v. *Brown*, 15 N. Y. 362; *Reed* v. *Gannon*, 50 id. 345.) Without the consent of all the purchasers together, to put a mortgage lien upon the property bought by purchasers at the foreclosure sale, the court could not create such a lien. (*Harmon* v. *Hope*, 87 N. Y. 13.) By his acts Vilas waived all claims, if any he had, under the agreement of August, 1858. (*Cobb* v. *Hatfield*, 46 N. Y. 533, 536; *Mills* v. *Hoffman*, 92 id. 181, 189; *Gould* v. *Cayuga Bk.*, 86 id. 75, 79; *Baird* v. *Mayor, etc.* 96 id. 599; *Branch* v. *Jessup*, 106 U. S. 468, 475, 476.)

*Alfred R. Page* for Richard J. Morrison, administrator, etc., appellant. The alleged order of March 10, 1858, was invalid and ineffectual to confer any rights until it was entered. (*Whittiker* v. *Defosse*, 7 Bosw. 678; *Star F. Ins. Co.* v. *Godet*, 34 J. & S. 366; *Stafford* v. *Ahibs*, 8 Abb. [N. C.] 240; *Newhouse* v. *Weimert*, Ct. of App.; *Scudder* v. *Snow*, 29 How. Pr. 96; R. S. pt. 2, Ch. 3, § 24.) The agreement between the receiver and Vilas did not follow and was not authorized by the order. The court had no power to establish and did not authorize a lien upon the property as against the purchasers. (*Lehigh C. & N. Co.* v. *N. J. Cent. R. R. Co.*, 35 N. J. Eq. 430; *Chicago* v. *Sheldon*, 9 Wall. 55; *Met. T. Co.* v. *T. V. & C. R. R. Co.*, 103 N. Y. 249; *Raht* v. *Attrill*, 42 Hun, 414; *Wallace* v. *Loomis*, 97 U. S. 146; *Miltenberger* v. *Logansport R. R. Co*, 106 U. S. 310.) Nothing is owing Vilas under the terms of the contract of August 27, 1858, he not having established his "absolute and beneficial ownership" of the property. (*Hoyle* v. *P. & M. R. R. Co.*, 54 N. Y. 328, 330; *Cumberland Coal Co.* v. *Sherman*, 30 Barb. 568; *Benson* v. *Heathorn*, 1 Y. & Col. 326; *Davoue* v. *Fanning*, 2 John. Ch. 25; *Gardner* v. *Ogden*, 22 N. Y. 327; *Butts* v. *Woods*, 37 id. 317; *Hubbell* v. *Medbury*, 53 id. 98; *Fulton* v. *Whitney*, 66 id. 548; *Munson* v. *S. G. & C. R. R. Co.*, 103 id. 58.) The personal judgment against Page and his associates was error, as there is nothing in the case to support it. (*Laurence* v. *Fox*. 20 N. Y. 268; *Ætna*

*Bk.* v. *Fourth Nat. Bk.*, 46 id. 82; *Garnsey* v. *Rogers*, 47 id. 233; *Merrill* v. *Green*, 55 id. 270; *Simson* v. *Brown*, 68 id. 355; *Vrooman* v. *Turner*, 69 id. 280; *Pardee* v. *Treat*, 82 id. 385; *Root* v. *Wright*, 84 id. 72; *Seward* v. *Huntington*, 94 id. 104; *Wheat* v. *Rice*, 97 id. 296; *Odell* v. *Mulry*, 9 Daly, 381, *Mellon* v. *Whipple*, 67 Mass. [1 Gray], 317; *Dow* v. *Clark*, 73 id. [7 Gray], 198; *Pettee* v. *Peppard*, 120 id. 523; *Exch. Bk.* v. *Rice*, 107 id. 37; *Cragin* v. *Lovell*, 109 U. S. 194; *Cottage St. Church* v. *Kendall*, 121 Mass. 528.) Presumption of knowledge, sufficient to put a purchaser on inquiry, only arises when he has been guilty of gross negligence. (*Acer* v. *Westcott*, 46 N. Y. 389; *Camb. V. Bk.* v. *Delano*, 48 id. 327; *Reed* v. *Gannon*, 50 id. 350.)

*Benjamin H. Bristow* for New York and Canada Railroad Company, and Delaware and Hudson Canal Company, appellants. Vilas had no lien upon the property after completion of the foreclosure sale. His rights then, if any, were solely against its proceeds. (*Revere Copper Co.* v. *Dimock*, 90 N. Y. 33; 117 U. S. 559; *Mut. L. Co.* v. *Dake*, 87 N. Y. 259; *Schell* v. *Stein*, 76 Penn. St. 398; *Wood's Appeal*, 82 id. 116; *Met. T. Co.* v. *Ton. V.*, etc., *Co.*, 103 N. Y. 245; *Raht* v. *Attrill*, 42 Hun, 414; *Railroad Co.* v. *Howard*, 7 Wall. 392; *Brown* v. *N. Y. & E. Co.*, 19 How. Pr. 84.) In no event could the receiver impose any charge upon the property other than that authorized by the order. (*Verplanck* v. *Ins. Co.*, 2 Paige, 452; *Hening* v. *R. Co.*, 63 How. Pr. 497, 514; *Booth* v. *Clark*, 17 How. 322, 331; *Cowdrey* v. *Galveston Co.*, 93 U. S. 352; *Stanton* v. *R. R. Co.*, 2 Woods. 506, 515; *Bk. of Montreal* v. *R. R. Co.*, 48 Ia. 518; *U. T. Co.* v. *R. R. Co.*, 7 Fed. Rep. 513; *Newbold* v. *R. R. Co.*, 5 Bradw. 367; *Turner* v. *R. R. Co.*, 95 Ill. 134; High on Receivers [2d ed.], § 398*d.*; *Vatable* v. *R. R. Co.*, 96 N. Y. 49; *McLaren* v. *Hartford Ins. Co.*, 5 id. 151; *Wood* v. *Chapin*, 13 id. 509; *Metz* v. *Buffalo Co.*, 58 id. 65; *Fisk* v. *Potter*, 2 Abb. [C. A. D.] 138; *Shaw* v. *R. R. Co.*, 100 U. S. 605; *R. R. Co.* v. *Howard*, 7 Wall, 392.) A lien could not sub-

sist at the same moment upon the proceeds realized from selling the property and upon the property from the sale of which these proceeds have arisen. The two are necessarily inconsistent and cannot co-exist. (*Morris* v. *Rexford*, 18 N. Y. 552, 557; *Gardner* v. *Ogden*, 22 id. 327; *Bk. of Beloit* v. *Beale*, 34 id. 473; *Moller* v. *Tuska*, 87 id. 166; *Second National Bank* v. *Burt*, 93 id. 233, 248; *Bowen* v. *Mandeville*, 95 id. 237; *Krumm* v. *Beach*, 96 id. 398.) Even if there had been an agreement for a lien upon the property after completion of the sale, it would be ineffectual as against these defendants, because they are purchasers in good faith without notice. (*Lomer* v. *Meeker*, 25 N. Y. 361; *Vrooman* v. *Turner*, 69 id. 280; *Williamson* v. *Brown*, 15 id. 354; *Reed* v. *Gannon*, 50 id. 345, 349; *Galveston* v. *Cowdrey*, 11 Wall. 482; *Cole* v. *Gourlay*, 79 N. Y. 527; *Wood* v. *Chapin*, 13 id. 509.) One who accepts a benefit under an instrument or transaction is thereby precluded from attacking it. (*Havens* v. *Sackett*, 15 N. Y. 365; *Horton* v. *Davis*, 26 id. 495; *Rapalee* v. *Stewart*, 27 id. 310; *Chipman* v. *Montgomery*, 63 id. 221; *Gould* v. *Cayuga Bk.*, 86 id. 75; *Mills* v. *Hoffman*, 92 id. 181; *Baird* v. *Mayor*, etc., 96 id. 587; *Sherman* v. *McKeon*, 32 id. 266; *Cobb* v. *Hatfield*, 46 id. 533; *Crawshay* v. *Soutter*, 6 Wall. 739; *Railroad Co.* v. *Howard*, 7 id. 392; *Smith* v. *Sheeley*, 12 id. 358; *Branch* v. *Jessup*, 106 U. S. 468; *Barnes* v. *R. R. Co.*, 8 Biss. 514; *Coleman* v. *Col. Oil Co.*, 51 Penn. St. 74; *Parks* v. *Evansville R. R. Co.*, 23 Ind. 567.)

*George H. Beckwith* and *Matthew Hale* for respondents. Neither the railroad company nor the plaintiffs in the foreclosure suit had any right or equity of redemption in the property in question. (2 R. S. 270, §§ 45 *et seq.; Olcott* v. *Tioga R. R. Co.*, 27 N. Y. 546; *So. Bapt. Church* v. *Clapp*, 18 Barb. 35; *Hoyle* v. *P. & M. R. R. Co.*, 54 N. Y. 329, 334; *Duncomb* v. *N. Y., H. & N. R. R. Co.*, 88 id. 1, 7.) If any equitable right of redemption existed, it was waived and lost by the delay of the parties entitled thereto.

(Code of Procedure, § 97 ; *Hubbell* v. *Sibley*, 5 Lans. 51, 58 ; 50 N. Y. 468; *Tibbs* v. *Morris*, 44 Barb. 146 ; *Peabody* v. *Roberts*, 47 id. 102 ; *Bruce* v. *Tillson*, 25 N. Y. 194 ; *Cleveland* v. *Boerum*, 24 id. 613, 617; 54 id. 330; *Duncomb* v. *N. Y., H. & N. R. R. Co.*, 84 id. 190, 199.) The contract of August 27, 1858, created a valid first lien upon the mort-gaged premises, in favor of Vilas, for the $18,000 and interest. (*People* v. *Cent. City Bk.*, 53 Barb. 412 ; *Wallace* v. *Loomis*, 97 U. S. 146 ; *U. Tr. Co.* v. *Ill. Mid. Co.*, 117 id. 434, 454, 455 ; *Jerome* v. *McCartee*, 94 id. 734, 738; *New* v. *Nichol*, 73 N. Y. 127, 131.) The purchase-price agreed upon between Mr. Vilas and the receiver, is a valid and subsisting lien on the mortgaged property, and none of the defendants are entitled to protection as purchasers in good faith without notice. (*Schafer* v. *Reilly*, 50 N. Y. 61 ; *Bush* v. *Lathrop*, 22 id. 535 ; *Fairbanks* v. *Sargeant*, 9 East. R. 207, Laws of 1869, chap. 917, § 5 ; *Reed* v. *Gannon*, 50 N. Y. 345, 350.) The defendants Page, Butler and Chase were properly made personally liable for the amount due Vilas under his contract. (*Burr* v. *Beers*, 27 N. Y. 178 ; *Curtis* v. *Tyler*, 9 Paige, 42.) The defendants are privies to the foreclosure suit, and to all the proceedings therein, and are bound by such proceedings, including the order of March 8, 1858, and the final judgment in favor of Vilas as if they had actually been parties thereto. (*Goddard* v. *Benson*, 15 Abb. 191 ; *Bennett* v. *Couchman*, 48 Barb. 73, 81–83 ; *Jenkins* v. *Fahey*, 32 N. Y. 353 ; *Manolt* v. *Petri*, 65 How. 206 ; *Adams* v. *Barnes*, 17 Mass. 365 ; *Campbell* v. *Hall*, 16 N. Y. 578, 579.)

ANDREWS, J. The validity of the order of March 10, 1858, lies at the basis of the lien claimed by the plaintiff under the agreement of August 27, 1858. The receiver had no power, as incident to his general authority as receiver, to create a lien on the property of the railroad company for the purchase of rolling stock. The jurisdiction of the court to appoint receivers of property has for its primary object the care and custody of the property which is the subject of the receiver-

ship, pending the determination of the questions involved in the litigation, and to enable the court, by placing the property under the control of its officer, to preserve it to answer the final decree which may be made in the action. But the receiver cannot of his own motion contract debts chargeable upon the fund in litigation. The court must authorize expenditures on account of the property before they can be charged thereon; and while it may, and does in its discretion, allow expenses incurred by a receiver strictly for preservation to be charged upon the fund, although incurred without the prior sanction of the court, it is, nevertheless, the order of the court and not the act of the receiver which creates the charge and upon which its validity depends.

The order of March 10, 1858, authorized the receiver to expend not exceeding $27,500 in the purchase of necessary rolling stock for the Plattsburgh and Montreal Railroad, upon a credit of not less than six months, provided the purchase should be approved by the plaintiffs or their attorney, and directed that the purchase-money of the mortgaged premises directed to be sold by the interlocutory decree of February 28, 1857, should be applied by the referee, first to the payment of his own costs and disbursements, and next to paying for the rolling stock which might be purchased by the receiver; and, further, that the "amount which the said receiver may so contract to pay for the rolling stock, with all interest that may accrue thereon, is hereby made a first lien on the said mortgaged premises, and all proceeds thereof which may come into this court, or are, or shall become subject to its disposition or authority." The order was granted upon the petition of the receiver, supported by the affidavit of the attorney for the plaintiffs in the action, which, among other things, represented that the rolling stock then in use had been hired by the receiver and was very scanty and inadequate to the proper working of the road.

The jurisdiction of a court of equity, having possession in a foreclosure action, through its receiver, of the property of a railroad company, to authorize the creation of debts for rolling

stock and other purposes, when in its opinion it is necessary so to do to secure the continued and successful operation of the road, and to charge the debts so created as a first lien on the mortgaged property, has of late years been the subject of consideration by the courts, and the doctrine that this jurisdiction appertains to the power of the court to appoint receivers is now firmly established. (*Wallace* v. *Loomis*, 97 U. S. 146; *Union Trust Co.* v. *Ill. Midland R. R. Co.*, 117 id. 434; *Woodruff* v. *Erie Railway Co.*, 93 N. Y. 609.) The order of March 10, 1858, was therefore a lawful exercise of the power vested in the court, and was binding upon the parties to the action, even if it had been made without their consent. But it was procured on the application of the receiver who represented the company in making the application, and of the plaintiffs, the trustees in the mortgages sought to be foreclosed, who with the individual co-plaintiff represented the bondholders, and neither the company nor the bondholders can assail its validity.

But it is insisted, on behalf of the grantees of the purchaser on the foreclosure sale, that, inasmuch as the order of March 10, 1858, was made after the sale under the foreclosure judgment, the court could not create a lien on the property purchased, without the consent of the purchasers, and that the purchasers, on completing their purchase, had the right to demand and receive a title subject only to such liens, if any, paramount to the mortgages foreclosed, as existed on the property at the time of the sale. The sale on the interlocutory judgment was made September 24, 1857, several months prior to the order in question. The property was bid off by a purchasing committee, representing nearly all the bondholders under the first mortgage, for the sum of $150,000, a sum much less than the amount of the mortgage. It does not appear with certainty that any payment was made at the time on account of the purchase. If any was made it did not exceed a few hundred dollars. In July, 1858, the referee made his report of sale, which was confirmed July 31, 1858, and this was followed August 20, 1868, by a conveyance

from the referee to the purchaser, which recites the sale of September 24, 1857, for the sum of $150,000. The consideration, however, was paid almost wholly by the surrender of bonds held by the purchasers. Meanwhile, from 1857 to 1868, a period of eleven years, the receiver remained in possession and operated the railroad without objection and apparently in the interest of the purchasers. During this time the order of March 10, 1858, was made, and on August 27, 1858, the receiver entered into the contract with the plaintiff Vilas, which has given rise to this controversy. The rolling stock purchased of Vilas was used by the receiver in operating the road up to the time of the conveyance to the purchasers on the foreclosure sale, and what remained was received by them and was used on the road down to the time of trial. The claim made that the purchasers on the foreclosure are not bound by the order of March 10, 1858, has no foundation in law or equity. When the order was made the title had not passed under the foreclosure sale. The sale of September 24, 1857, was afterwards vacated and the road was advertised for resale under the decree in 1863, but was not again sold, and for some reason not disclosed, the order vacating the original sale was itself set aside and a conveyance finally made pursuant thereto. The rolling stock authorized to be purchased by the order of March 10, 1858, would on its purchase belong to the estate owned by the mortgagor, out of which the purchase-money was to be paid. The purchasers by their conduct and delay acquiesced in the operation and management of the road by the receiver in the usual way. The court was not divested of its power and duty of managing the property by reason of a sale which the purchasers delayed or neglected for many years to complete. If the court after a sale, and before completion, had made an inequitable or improvident order injurious to purchasers, it would present a ground on which to base an application by them to be released from the purchase. The purchasers in this case have no equity to be relieved from the just operation of the order in question.

There is another question raised by the appellants which it
is proper to consider before considering the questions arising
upon the agreement of August 27, 1858. It is claimed that
the lien, authorized by the order of March 10, 1858, was upon
the proceeds of the sale of the mortgaged property only, or
at least that upon the completion of the sale and the convey-
ance of the property pursuant thereto, the lien was transferred
to the proceeds and that the remedy, if any, to enforce the
lien was against the proceeds only and could not be pursued
against the property which was the subject of the sale. There
can be no doubt of the general principle that assets derived
from the sale of mortgaged property on the mortgage become,
as regards creditors, the substitute for the things sold, and
that the claims of creditors are transferred by the sale to the
fund, and that the purchaser takes the land freed from the
claims of general creditors. (*Railroad Co. v. Howard*,
7 Wall. 392.) But this case is not within this principle. It
cannot be disputed that it was the intention of the court, by
the order of March 10, 1858, to authorize a lien to be created
on the *corpus* of the property for the price of the rolling
stock which should be purchased by the receiver. The
language of the order permits no other construction. The
words are that the purchase-price " is hereby made a first lien
on the said mortgaged premises." It is also true that it was
made a lien " on all proceeds which may come into this court,
or are or shall be subject to its disposition or authority," and
the order authorized the referee to pay the debt which might
be contracted for rolling stock out of the purchase-money.
When the order was made the property had been sold, but
the purchase-money had not been paid and it was uncertain
whether the sale would be completed. In fact the purchase-
money was never paid beyond a trifling amount, except con-
structively by the purchasers canceling bonds secured by the
mortgage. There were no proceeds of the sale received by
the referee or which came into his possession or under the
control of the court. If the purchasers on the sale, whether
bondholders or third persons, had paid the purchase-money

in cash or secured its payment, there would, we conceive, be no doubt that the lien would be transferred to the proceeds. There would then be a substitute for the thing sold, upon which the lien would attach, relieving the land in the hands of the purchasers. But it could not have been the intention of the court to make a constructive payment on a purchase by the mortgagees, through a cancellation of the mortgage debt, equivalent to an actual payment, so as to relieve the property from the charge. Such a lien would be illusory merely, having no substantial quality. The purchasers cannot claim to have the premises purchased discharged from the lien, and whether the present holders of the property stand in any better position will be considered hereafter.

The final objection to the order of March 10, 1858, as constituting a basis for a lien, rests upon the conceded fact that it was never entered by the clerk in the records of the court until after the commencement of this action. It was duly made at Special Term and allowed by the court, and at the foot of the order was a direction that it should be entered, made by the judge by whom the order was granted. The order was duly filed in the proper clerk's office on the day of its date, and the clerk indorsed thereon the date of the filing. But by mistake of the clerk it was not at the time transcribed in the records. We are of opinion that the order became effective as an authority to the receiver upon its being filed with the clerk, and that the mistake of the clerk cannot, on the one hand, operate to the prejudice of parties dealing with the receiver in reliance upon the order, or, on the other, furnish a defense to other persons which they would not have had if the order had been promptly recorded.

The principal question upon the agreement of August 27, 1858, arises upon the clause which provides " that if it shall be finally determined in and by this or any other action or proceeding that the said property belongs absolutely and beneficially to the said Vilas, he shall be paid for the foregoing release the sum of eighteen thousand dollars, with interest from the first day of May last." It is claimed, on the one

hand, that the final adjudication in the Court of Appeals in 1873, in the Vilas branch of the foreclosure action, that the mortgages were not at the time of the sale and purchase by Vilas in April and May, 1854, of the rolling stock and other personal property of the Plattsburgh and Montreal Railroad Company, upon execution against the Company, liens or incumbrances thereon as against the judgments and executions upon which it was sold; and " that the legal title to said rolling stock and personal property mentioned in the answer of the said defendant Vilas became vested in him on the purchase thereof, as mentioned in said answer," with the reservation " that this judgment be without prejudice to any equity of redemption which the plaintiffs had, if any, at the time of commencing the action," was an adjudication that the property belonged " absolutely and beneficially " to Vilas, within the true meaning of the contract. On the other hand, it is insisted by the defendants that the judgment itself recognized the possible existence of an outstanding equity in the plaintiffs in the foreclosure action to redeem from the sales on the executions, and that the conceded fact that Vilas, at the time of his purchase on the execution sales, was a director of the Plattsburgh and Montreal Railroad Company, the defendant in the executions, brings his title within the rule in equity that one occupying a fiduciary relation cannot purchase for his own use, and hold absolutely against the *cestui que trust*, the trust estate. There was, therefore, it is claimed upon the conceded facts, an outstanding equity of redemption which could be enforced either by the company or its mortgagees; or, at all events, the facts raised a question as to the character of Vilas' title, which has not been finally determined, and, therefore, the condition upon which the liability to pay the $18,000, under the agreement of August 27, 1858, has never been fulfilled. Before coming to this main question there is a preliminary question made by the appellants that the agreement was not authorized by the order of March 10, 1858. The order was that the purchase-money of the rolling stock should be a lien upon the " mortgaged prem-

ises, and all proceeds thereof." The contract provided that
it should be a lien on the "mortgaged premises" sold by the
referee and that the purchasers should give a mortgage there-
for. The point is that the order authorized a lien on the pro-
ceeds, while the contract provided for a lien on the mortgaged
property. It is to be observed that the provision in the order
for a lien was for the protection of persons who might be
willing to sell rolling stock to the receiver. The order
authorized a lien both on the property and its proceeds, which,
on the payment of the sum bid on the foreclosure, would be
transferred to the proceeds of the sale in exoneration of the
property. Before the order and contract were made the road
had been sold on the foreclosure, but the purchasers had not
paid their bid. If, in the litigation with Vilas, his title to
the rolling stock should be defeated, or be held subordinate
to the lien of the mortgagees, nothing would become due to
him under the contract. It might happen, however, indeed
it was probable, that before this litigation was determined the
purchasers on the foreclosure sale would be ready to complete
their purchase. The contract, therefore, provided for a lien
on the mortgaged property and a reservation by the purchasers
on the foreclosure, out of the purchase-money of a sum suffi-
cient to pay the amount "which may become due to Vilas
under and by virtue of this agreement," and that the purchasers
should give him a mortgage therefor. This arrangement was,
we think, within the scope of the authority conferred by the
order of March 10, 1858. It charged both the property and
the proceeds with the lien and secured the ultimate payment
out of the proceeds, if a right thereto should be established.

Returning, therefore, to the question of the construction
of the clause in the agreement of August 27, 1858, already
quoted, with a view of ascertaining whether the judgment of
the Court of Appeals in 1873 fulfilled the condition of the
agreement and finally determined "that the said property
belongs absolutely and beneficially to the said Vilas," it is
important to consider the extrinsic circumstances which are
often persuasive elements of interpretation. The agreement

was entitled in the foreclosure action. The complaint in that action alleges that Vilas and other defendants had or claimed some interest in the mortgaged property, but which, as the plaintiffs averred, was subordinate to the lien of the mortgages. Vilas, in his answer, set up his title as purchaser of rolling stock and personal property of the Plattsburgh and Montreal Railroad Company under the execution sale in 1854, and that the plaintiffs' mortgages were not liens on the rolling stock and property so purchased by him, and also that the mortgages, not having been filed as chattel mortgages, were void as against the creditors in the executions and the sale thereunder. The interlocutory judgment of February 28, 1857, expressly reserved from the sale to be made thereunder the property claimed by Vilas, and as to that it directed that it be referred to the referee to " inquire and report as to the issues raised in this action between the plaintiffs and the defendant Samuel F. Vilas, and whether or not the locomotive engines, tenders, cars and any other personal property in the answer of the said defendant Vilas mentioned, or any or what part or parts thereof are or is subject to the lien of the said two mortgages and either and which of the same." The only issue raised by the pleadings in the Vilas branch of the litigation and the only issue which was referred, related exclusively to the questions, *first*, whether the mortgages covered the property in question, and *next*, whether the omission to file them as chattel mortgages rendered them void as against creditors. Up to the time of the agreement of August 27, 1858, the question, so far as appears, had never been mooted by any one, neither by the company, the mortgagees, the bondholders, or the receiver, that the title of Vilas under his purchase was redeemable by reason of his relation as director of the company. The company had apparently acquiesced in the validity of his title by renting the property for the use of the road immediately after his purchase. Subsequently its lessee hired the rolling stock from Vilas, and the receiver on his appointment February 21, 1857, also leased from Vilas the portion then owned by him, and was using it on the road as

lessee when the agreement of August 27, 1858, was made.
It is material in determining the construction of the agree-
ment to take into view the situation as between the mortgagees
and Vilas created by the purchase by Vilas under the execu-
tions in 1854. Vilas, by his purchase, acquired the legal title to
the property. This was decided by the Commission of Appeals
in the foreclosure action. (*Hoyle* v. *P. & M. R. R. Co.*, 54
N. Y. 314.) Whether his title was subject to or free from the
lien of mortgages depended (as to all the property except four
platform cars purchased by the company after the mortgages
had been executed), upon the question whether they were subject
to the provisions of the chattel mortgage act requiring chattel
mortgages to be filed in the town clerk's office to make them
valid as against creditors. As between the company and the
mortgagees, the mortgages were valid although not filed. When
the agreement of August 27, 1858, was made the question
whether the title of Vilas was "absolute and beneficial," in
the sense that it was paramount to the mortgages or was subject
and subordinate to the mortgage lien was a controverted, but,
as yet, an undecided, question. The question was decided in
1873, adversely to the mortgagees, in the case referred to.
The courts below have held that the language of the agree-
ment had reference to this situation, and not to a possible
right of redemption, which, so far as appears, was not at the
time in the minds of any of the parties. There are other
considerations which confirm this construction of the agree-
ment. The right of redemption, if it had existed, was value-
less provided the company or mortgagees in exercising it
would be required to pay not only the purchase-money paid
by Vilas on the purchase of the property, but his debt against
the company, for which he obtained judgment a few days
after the sale. Vilas, in making the purchase openly, acted
in his own interest and refused to buy in for the benefit of
the company, which, as the case shows, was then insolvent.
The construction of the agreement claimed in behalf of the
appellants, that the condition that the title shall be determined
to be "absolutely and beneficially" in Vilas, requires that it

should be determined not only that his title was not subject to the mortgages, which was substantially the only issue in the action, but also that it was not subject to redemption, if sustained, places Vilas in the position of abandoning all claim for compensation if it should be held that there was an outstanding equity to redeem from the sale, although he might on redemption, except for this agreement, have been equitably entitled to the payment of his debt as a condition to the avoidance of his title. This is distinctly insisted upon in the brief of one of the counsel. He says: "There can be no question of terms of redemption; the terms are fixed by the contract, $18,000 if Vilas establishes his absolute and beneficial ownership; if not, nothing." It is difficult to suppose that this could have been the intention of the parties to the instrument. The meaning of the clause in question is further indicated by the provision in the contract that if it should be finally determined that Vilas is entitled "to a part, but not to the whole of said property," a proportionate share of the purchase-price only should be paid. If the parties had in view the question of redemption, it is difficult to assign a reason for this provision, as either the whole or none of the property was redeemable. If the clause relating to the "absolute and beneficial" title referred to the title of Vilas as against the mortgagees, the second clause referred to is significant, since it might be held that although the title of Vilas was subject to the mortgages, nevertheless that the mortgage lien did not cover the four platform cars purchased by the company after the mortgages were executed, which were included in Vilas' purchase and were transferred by the agreement to the receiver. The provision reserving the question of rents, saved to the mortgagees and the receiver the right to claim the benefit of rents paid after the receiver took possession under the mortgagees, to which the mortgagees would be entitled if the lien of the mortgages was paramount to the title of Vilas. The agreement of August 27, 1858, moreover, contemplated that the determination referred to might be had in the foreclosure action. The right of redemption could not be determined

under the issue presented in that action. The subsequent words, " or any other action or proceeding," were probably inserted to provide against the contingency of a discontinuance of the foreclosure action. The question of construction is by no means free from difficulty, but we are of opinion that reading the contract in the light of the circumstances, the clause in question referred to 'a determination of the issue raised in the foreclosure action, and that the judgment of the Court of Appeals, adjudging that Vilas acquired by his purchase the legal title to the rolling stock, which was paramount to the lien of the mortgages, satisfied the condition of the contract and entitled him to payment of the stipulated price and a lien therefor on the mortgaged property.

But it is insisted that the equitable lien, if it existed before the conveyance of the property on the foreclosure sale, cannot be enforced against the present owners, for the reason that they and their grantors were purchasers in good faith for value, without notice, and are therefore entitled to protection under the general rule of law. The sale in the foreclosure action, made September 24, 1857, as has been stated, was not completed by a conveyance until August 20, 1868. On that day the referee, pursuant to the order of the court, conveyed the mortgaged property to the committee of bondholders who were the purchasers on the sale, for the expressed consideration of $150,000, in which conveyance the plaintiffs in the foreclosure action, the trustees under the mortgage, joined. On the same day (August 20, 1868), the purchasing committee, the grantees in the referee's deed, conveyed the same property to the defendant, the Montreal and Plattsburgh Railroad Company, a new corporation organized to take the title to the property. Subsequently the defendant, the Delaware and Hudson Canal Company, purchased the stock of the Montreal and Plattsburgh Railroad Company. Still later, in 1873, the defendant, the New York and Canada Railroad Company, was organized by the consolidation of several continuous lines of road, under authority of the act, chapter 917 of the Laws of 1869, of which consolidated road the Delaware

and Hudson Canal Company is lessee. Neither of the convey-
ances of August 20, 1858, purported to transfer the property
embraced in the Vilas purchase, but, in terms, excluded it
therefrom, nor was either conveyance made subject to his
claim. The referee could not convey the Vilas property,
because it was not embraced in the sale, and the purchasing com-
mittee could convey only what they had purchased. But on the
26th of September, 1868, the persons who, on the 13th of Sep-
tember, 1867 (the date of the agreement with Page and others),
owned nearly all the bonds of the Plattsburgh and Montreal
Railroad Company secured by the first mortgage, together with
the receiver Platt and another person (whose interest in the
transaction is not disclosed), executed a transfer in writing,
under seal, to the Montreal and Plattsburgh Railroad Company,
of all their right, title or interest in the locomotives and other
property purchased by Vilas at the execution sale in 1854,
and this property, purchased by Vilas, embraced in the agree-
ment of August 27, 1858, has followed the road through all
transmutations of title, and has been used thereon by the
several grantees and lessees thereof so long as it was capable
of use. In considering whether along this chain of title there
has intervened a purchaser for value, whose title was freed
from the equitable lien created by the contract of August 27,
1858, we may dismiss any claim to such exemption on the
part of the defendants, the New York and Canada Railroad
Company and its lessee the Delaware and Hudson Canal
Company, by a reference to the act of 1869, which saves the
rights of all creditors and bondholders of any company
embraced in this consolidation, authorized by that act. It
was the evident purpose of the statute that the existing status
of each separate company should, as respects creditors and
bondholders, remain unimpaired and unaffected by the con-
solidation (§ 5). So also, for reasons which have been indi-
cated, the purchasers on the foreclosure do not occupy the
position of purchasers for value without notice, and their
title, under the referee's deed, was subject to the lien, not for
the reason that it was so declared in the conveyance, for, as

has been stated, there was no such declaration, but because
the agreement of August 27, 1858, was made by their repre-
sentatives and of which they also had actual notice.   The
question is, therefore, narrowed to the consideration of the
title of the Montreal and Plattsburgh Railroad Company.
That company was organized concurrently with the convey-
ances of August 20, 1858, for the purpose of taking the title to
the property and franchises of its predecessor, the Plattsburgh
and Montreal Railroad Company.   It was organized pursuant
to an agreement made September 13, 1867, between Timothy
Hoyle, Michael J. Myers and Moss K. Platt, who were then
the owners of $179,200 in amount of the first mortgage bonds
of the Plattsburgh and Montreal Railroad Company, of the
first part, and John B. Page and others, of the second part.
Without going into detail, it is sufficient to state that in its
general scope it was a contract on the one side to sell to Page
and his associates the bonds of the road held by them, upon
certain considerations therein expressed, with a view on the
part of the purchasers, through the ownership of the bonds,
to acquire title to the property of the Plattsburgh and Mon-
treal Railroad Company, and to organize a new corporation,
to whom the title should be conveyed.   This scheme was
carried out, and Page and his associates caused the property
to be conveyed to the Montreal and Plattsburgh Railroad
Company in exchange for its stock.   It was found by the
learned trial judge that when the agreement of September
13, 1867, was made Page and his associates had actual notice
of the order of March 10, 1858, and of the agreement of
August 27, 1858, between the receiver and Vilas.   It cannot
be maintained, we think, that there is no direct evidence, to
support the finding.   The circumstances also tend to support
it.   It will be remembered that when the contract of Septem-
ber 13, 1867 was made, Vilas had no claim except under the
contract of August 27, 1858.   He had released his title to
the rolling stock, whatever it was, to the receiver.   The
property had by the release become a part of the assets of the
railroad company, and all that was left to Vilas was the con-

tingent right under the agreement to be paid the sum of
$18,000. Platt, one of the parties to the agreement of Sep-
tember 13, 1867, was the person who, as receiver, had made
the contract with Vilas, and with his co-contractors owned
nearly all the first mortgage bonds of the Plattsburgh and
Montreal Railroad. By the contract with Page and his
associates, the sellers of the bonds agreed that the new
corporation should acquire title to all the property of its
predecessor, "subject to the claim of S. F. Vilas, hereinafter
referred to, if any shall be finally adjudged." By a subse-
quent clause in the contract the sellers agreed to pay a certain
sum to the second mortgage bondholders, and also "the
amount due for land damages and claims, and any floating
debts incurred by the receiver, which constitute any lien
upon the railroad." They also agreed to pay the costs in the
foreclosure suit, except in the Vilas branch of that suit, and
in that branch to pay the plaintiff's costs to date. The con-
tract then continues, "the purchasers are to assume the conduct
and prosecution of that suit and to abide its result and judg-
ment, and if there should be any recovery in said Vilas' favor,
the purchasers agree to indemnify said parties of the first part
and said Platt, as receiver, against the same." The provision
that the purchasers should take "subject to the claim" of
Vilas, was, in the actual situation, without meaning, unless it
related to the claim which, as the result of the litigation in
the Vilas branch of the foreclosure, would be established
against the property under the agreement of August 27, 1858.
Whatever title Vilas acquired under his purchase on the
execution sales, has been released and extinguished by his
voluntary act, and he could never reclaim it. Page and his
associates were by the agreement to be vested with the title
to this as well as the other property of the railroad. They
agreed to take subject to Vilas' claim and to abide the result
of the foreclosure action. That result, whatever it might be,
could not affect their title to the property agreed to be pur-
chased, unless it operated to create a lien in favor of Vilas,
under the agreement of August 27, 1858. We think

there is reasonable ground to infer, as stated in the opinion at Special Term, that the parties to the contract of September 13, 1867, "had reference to an arrangement not disclosed in the pleadings (in the foreclosure action), dependent on the result and judgment in the suit which the purchasers under the agreement agreed to abide." Page and his associates were purchasers of the bonds and, *pro tanto*, of the mortgage security, and took them subject to the equities of third parties. The Montreal and Plattsburgh Railroad Company represented simply the purchasers of the bonds, and paid no value, and held the property subject to any equitable lien to which it was subject in the hands of its grantors. We are, therefore, of opinion that the purchase-price of the rolling stock, fixed by the agreement between Vilas and the receiver, is a valid lien upon the mortgaged property.

The personal judgment awarded against Page and his associates has, we think, no legal foundation. It proceeds on that clause in the agreement of September 13, 1867, by which Page and his associates agreed to "assume the conduct and prosecution of that suit (the Vilas branch), and to abide its result and judgment, and if there shall be any recovery in Vilas' favor, the purchasers agree to indemnify said parties of the first part and said Platt, as receiver, against the same." There is no promise to pay Vilas the amount of his claim, nor was the promise to abide the result of the litigation, or to indemnify the vendors in the contract, made for his benefit, within *Lawrence* v. *Fox* (20 N. Y. 268), and kindred cases. The agreement to abide by the result of the litigation was intended to protect the vendors against any claim by Page and his associates, in case the title of Vilas to the rolling stock, or his lien on the mortgaged property should be sustained. The latter part of the clause is a contract strictly of indemnity. The vendors have not been damnified, nor is it easy to discover how they ever can be. The agreement of August 27, 1858, expressly exempts the receiver from personal liability for the purchase-price of the rolling stock, and the other vendors, in the agreement of September 13,

1858, have never, so far as appears, become liable to Vilas or assumed the payment of his debt. The indemnity clause may have been inserted to protect the vendees against a possible award of costs in the litigation of the Vilas claim. But whatever may have been in the contemplation of the parties, it clearly imposed no personal liability upon Page and his associates to Vilas. It is not necessary to determine whether, independently of the agreement of September 13, 1867, any ground exists for charging the defendant Page with the payment of the lien debt. The complaint proceeds exclusively upon his obligation under that agreement.

We are also of opinion that the costs adjudged in favor of Vilas in the foreclosure action are not comprehended in his agreement with the receiver and cannot be charged as a lien upon property in the hands of the present defendant.

Our conclusion is that the personal judgment against the individual defendants should be reversed, with costs against the plaintiff, and that it be modified in respect to charging the costs in the foreclosure action as a lien, and by making the mortgaged property in the hands of the corporations defendant primarily liable; and that, as so modified, the judgment be affirmed, with costs against the corporations defendant.

All concur, except Peckham, J., not sitting.

Judgment accordingly.